**Alan E. LEWIS and Harriet R. Lewis, Petitioners, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

No. 93–1365.

United States Court of Appeals, First Circuit.

Heard Oct. 4, 1993.

Decided March 17, 1994.

David R. Andelman with whom Edward F. Fay, Colleen A. Brady and Lourie & Cutler, P.C. were on brief for appellants.

Kenneth L. Greene, Attorney, Tax Division, U.S. Department of Justice, with whom Michael L. Paup, Acting Assistant Attorney General, Gary R. Allen and Curtis C. Pett, Attorneys, Tax Division, U.S. Department of Justice, were on brief for appellee.

Before BREYER, Chief Judge, ROSENN,* Senior Circuit Judge, and CYR, Circuit Judge.

BREYER, Chief Judge.

Alan and Harriet Lewis appeal from a Tax Court decision assessing taxes upon $1,062,500, which a Lewis-controlled corporation called "ILT" distributed to the Lewises in 1984. In the Tax Court's view, that money represented an ILT "dividend," paid to the Lewises at that time. *See* I.R.C. § 301(a), (c)(1)–(3) (1986). The Lewises disagree. They point out that a "dividend" must come from a corporation's "earnings and profits." *See id.* § 316(a). And, they argue, ILT had no "earnings and profits," either in or before 1984, from which it might have paid a "dividend" in 1984. The Tax Court's contrary conclusion, they believe, rests upon a simple, and clear, *factual* error.

The Lewises further argue that, if ILT's distribution of the $1,062,500 is not a dividend, neither is it any other kind of 1984 taxable "income." *See id.* § 61 (defining "gross income" as "all income from whatever source derived"). Rather, in their view, the 1984 distribution represents income that they constructively received in, and accumulated from, earlier years, namely from the years 1974 through 1980. The Lewises concede that they *should have paid* (but *never have paid*) income tax on this money sometime between 1974 and 1981. But, as *all* parties concede, the statute of limitations now bars the Commissioner from assessing taxes for those earlier years. And, in the Lewises's view, the Commissioner cannot subvert the letter, and the spirit, of that statute by taxing *now* income that the government should have taxed *then*. The Lewises conclude that

we should, therefore, simply reverse the Tax Court's determination.

In our view, the Lewises are correct about the Tax Court's factual error. The record makes clear that the 1984 distribution did not come from ILT's "earnings and profits." It is, as the Lewises say, some form of accumulated income that the Lewises "constructively received" in prior, and now-closed, tax years. But, whether or not the Lewises must pay taxes on that distribution is a different matter. In adjudicating tax cases, the courts have developed a type of estoppel known as "quasi estoppel" or the "duty of consistency," whereby a taxpayer may not take a position in one year to his advantage, and then at some later point, after correction for that year is barred by the statute of limitations, adopt a contrary position touching on the same facts or transaction. Jacob Mertens, Jr., *The Law of Federal Income Taxation* § 60.05 (1992). Whether that doctrine requires the Lewises to treat the 1984 ILT distribution as taxable income is a matter so far addressed only superficially by the parties and upon which we wish the Tax Court's views. We therefore decline the Lewises's invitation to hold that the $1,062,500 is not taxable to them in 1984, and we remand this case to the Tax Court for further proceedings.

## I

### Background Facts

To understand the Tax Court's factual error, one must have in mind a rather complex (and here undisputed) set of events, some of which took place before, and others after, December 1980, when ILT's bank account showed a zero balance.

### A

### Before December 1980

This case arises out of an effort by Alan Lewis, and Steven Belkin, his business associate, to avoid paying federal income taxes on revenue generated primarily in Europe by

---

* Of the Third Circuit, sitting by designation.

their travel business, Trans National Travel ("TNT"). Two key sets of events took place before December 1980. First, between 1974 and 1980, Lewis and Belkin had TNT employees send TNT revenue generated by the sale of local (e.g., European city) tours in Europe to the Cayman Island bank account of ILT, a foreign corporation that they owned and controlled. ILT transferred *some* of the money received from TNT to two Cayman Island trusts. Those trusts, it later turned out, were "grantor" trusts of Lewis and Belkin (meaning, basically, that Lewis and Belkin should have paid income tax on the money those trusts received when the trusts received it.)

Second, and more important for present purposes, between 1977 and 1980 ILT "loaned" the *rest* of the money received from TNT to two limited partnerships formed and controlled by Lewis and Belkin. In effect, this was money "loaned" by Lewis and Belkin to themselves, for the purpose of making some personal investments. The total amount of these "loans" was approximately $2.075 million. There were three such "loans," each of which involved money that travelled a circuitous path, reaching Lewis and Belkin through paper intermediaries:

a) In 1977, ILT loaned $800,000 to Gran Compania De Comercio, which reloaned the money to Windikip Financieringsmaatschappij B.V., which in turn reloaned the money to Charlesgate West Associates. We assume that Gran Compania and Windikip were Lewis/Belkin-controlled entities that existed only on paper (though their use may have avoided the need to withhold U.S. taxes on interest payments). Charlesgate was a Lewis/Belkin real estate partnership, which used the money for the benefit of Lewis and Belkin.

b) In 1978, ILT loaned Charlesgate West Associates an additional $600,000, using the same intermediaries.

c) In 1980, ILT loaned $675,000 to a Lewis/Belkin-controlled real estate partnership named Taunton Boulevard Associates, which used the money for their benefit. This time the intermediaries consisted of two different foreign enti-

ties called "Mido Capital Venture, N.V." and "Bristol Realty Trust."

In each instance, the lending entity and all the borrowing entities created all the necessary loan-related documentation. Thus, on paper, it seemed as if Charlesgate owed Windikip (which owed Gran Compania, which owed ILT) regular payments of interest plus repayment of principal. Similarly, it seemed, on paper, as if Taunton owed Bristol (which owed Mido, which owed ILT) regular payments of interest plus repayment of principal. The Tax Court found, however, that neither Lewis nor Belkin, the persons in control of Charlesgate and Taunton Associates, ever intended to pay back the $2.075 million in "loans" to ILT. Hence, for tax purposes, they were not loans at all.

By the end of 1980, ILT apparently had paid out all the TNT money it had received either 1) to the Lewis/Belkin "grantor" trusts, or 2) to the Lewis/Belkin real estate partnerships by way of the $2.075 million Charlesgate and Taunton loans. As we have said, the Tax Court found that, as of December 31, 1980, ILT's bank balance was zero.

## B

### *After 1980*

Three significant events occurred after 1980. First, in 1983, Belkin and Lewis ended their business association. As part of their consequent efforts to divide property jointly owned or controlled, they decided to repay the three "loans" from ILT. They therefore reversed the "money flow," having (in the one case) Gran Compania (paid by Windikip, paid by Charlesgate) pay ILT $1.4 million, and (in the other case) Mido Capital (paid by Bristol Realty, paid by Taunton) pay ILT $708,658.

Second, ILT, having received this money (plus related interest) from Gran Compania and Mido, divided it in half, distributing $1,079,329 to Belkin's "grantor" trust and $1,079,329 to Lewis's "grantor" trust. The adjusted amount ($1,062,500) of this distribution to Lewis's "grantor" trust in 1984 (which, as noted above, amounts for tax purposes to a distribution to Lewis himself) is the money at issue here.

## II

### *The Tax Court's Error*

The factual record, as just described, suggests that the underlying, and possibly difficult, question in this case is not one of finding the facts, but rather, one of *characterizing* facts that are essentially beyond dispute. Is ILT's 1984 distribution of roughly $2.159 million taxable "income" to its recipients in light of the fact that that distribution *originated* in the repayment of sham loans (made in years now closed to review), the funds for which "loans," in turn, originally took the form of what may have been taxable (but untaxed) income to those same recipients (again, in years now closed to review)? The Tax Court avoided this question, however, by finding as fact that ILT had *other* "earnings and profits" out of which its 1984 distribution could have been made. The Tax Court found that

> between 1981 and 1984, unidentified amounts were deposited into and/or credited to ILT's Cayman Islands bank account in the approximate amount of $4.5 million.

Since the law presumes that a corporate distribution comes from "earnings and profits," leaving the taxpayer to show the contrary, *see Hagaman v. Commissioner*, 958 F.2d 684, 695 n. 16 (6th Cir.1992) (citing cases), were it true that $4.5 million in "unidentified amounts" were (between 1981 and 1984) "deposited into and/or credited to ILT's Cayman Islands bank account," the law would simply presume that the $2.159 million payment in 1984 was a "dividend." (This is so because $4.5 million minus the $2.159 million loan repayment would still have left ILT with $2.341 million in "earnings and profits"—enough to support a $2.159 million dividend.) And, the Lewises would have to pay taxes upon that dividend income.

Unfortunately for the Commissioner, the record makes clear that it is *not* true that ILT had some *other* significant source of income. The 1981–1984 ILT bank account deposits are fully explained; and, ILT did not have $4.5 million in "earnings and profits," accumulated or otherwise. The Tax Court's finding to the contrary is "clearly erroneous." *See, e.g., Hagaman*, 958 F.2d at 690 (Tax Court's findings accepted on appeal unless "clearly erroneous").

We reach this conclusion because Lewis himself testified, *without contradiction,* that ILT had no other income. He said that ILT was formed to serve as a tax-saving entity for TNT's "local tour" money (in other words, that ILT was a sham corporation), that the transfers of that "local tour" money constituted ILT's *sole* significant source of "income," and that TNT did not transfer *any* money to ILT after 1980. Lewis's testimony is supported by the Tax Court's own explanation of the workings of the Lewis/Belkin tax avoidance plan, which fully accounts for the money that ILT received. Nothing in that explanation suggests that ILT had some *other* source of income.

Finally, and most important, the Commissioner introduced into evidence (over the Lewises's objection) ILT's 1981–1984 bank account records. Those records confirm that ILT's income during that period consisted of 1) interest paid on the Charlesgate and Taunton "loans," 2) interest earned on the account balance, and 3) the return of the Charlesgate and Taunton "loan" principals in 1984. (We attach that exhibit as an Appendix here.) The Lewises in their brief go through each entry, showing how it falls into one of these three categories (with the exception of two bank errors—a deposit notation of $1.415 million (4/26/84), reversed the same day, and a deposit notation of $37,625 (5/25/84), reversed about one month later). Their explanation is supported by the facts that 1) the bank statement shows large deposits in the very "loan return" amounts that the Tax Court mentions, 2) many smaller deposits refer to "Mido" or "Gran Compania," the entities that should have paid ILT interest on the loans, 3) the other deposits, totalling roughly $2.7 million, bear references of "from fixed [or 'call'] deposit," which is how banks sometimes label redeposits from interest-bearing instruments, and 4) the Lewises, in their amended tax returns for 1983 and 1984, described the interest payments as "interest" and paid taxes on them. Not a word in the record, or in the Commissioner's brief, casts doubt upon the Lewises's

explanation of the record of ILT's account activity.

To understand the Lewises's explanation of the transfers to, and redeposits from, certain interest-bearing instruments labelled "fixed" or "call" "deposit," consider the following hypothetical example. Suppose a depositor instructs a bank to take money from his account and invest it in an interest-bearing instrument (contained, or not contained, in a separate interest-bearing account), and to "roll over" the investment from time to time as the interest-bearing instrument expires. Suppose, for example, that on January 1, John Smith deposits $10,000 in the local bank, along with an instruction to invest the money in Treasury Bills that expire every three months and that pay an annual interest of 5%. Smith's bank statement might look something like this:

| Date | Deposit | Withdrawal | Balance |
| --- | --- | --- | --- |
| Jan 1 | 10,000 | | 10,000 |
| Jan 1 | | 10,000 (to T'bills) | 0 |
| March 31 | 10,125 (from T'bills) | | 10,125 |
| April 1 | | 10,000 (to T'bills) | 125 |
| June 30 | 10,125 (from T'bills) | | 10,250 |
| July 1 | | 10,000 (to T'bills) | 250 |
| Sept 30 | 10,125 (from T'bills) | | 10,375 |
| Oct 1 | | 10,000 (to T'bills) | 375 |
| Dec 31 | 10,125 (from T'bills) | | 10,500 |

The Commissioner might use this kind of bank statement as evidence that Smith had interest income of $500, or even as evidence that Smith had income of $10,500 (if the source of the initial $10,000 deposit is not otherwise explained). But, we do not see how the Commissioner—or, as in this case, the Tax Court—could add up all the deposits and then use this statement as evidence that Smith had income of $50,500. The statement shows the contrary.

In our view, ILT's bank account, in respect to its "fixed/call deposit" references, is that of our hypothetical. The Lewises say in their brief that the back-and-forth transfers of money between ILT's account and "fixed [or 'call'] deposit" represent *intra-account* transfers to and from the "checking" and "investment" portions of the single account. This explanation makes sense given what we understand about standard banking activity (*i.e.,* "fixed deposit" may denote a fixed-term, interest-bearing certificate of deposit, and "call deposit" may denote an interest-bearing instrument, say an investment in a money market fund, which can be recalled on demand of the depositor). Moreover, *nowhere* does the government deny that these transfers of money were short-term investments of the kind just described. In essence, the government concedes the point.

The government argues that the Lewises should lose, even if their bank deposit explanation is believed, because they did not advance that explanation at the Tax Court's initial proceeding. The Lewises *did* advance that explanation, however, in a motion for reconsideration, immediately after they saw what the Tax Court had written. One can meet a burden of proof without disproving, in advance, all logical alternative possibilities. It seems reasonable for them not to have made an issue of the matter earlier, and to have assumed that the government and the Tax Court would read a bank deposit state-

ment in accordance with ordinary commercial banking practices.

Of course, one might wonder how we can be so certain that the Lewises are right about the meaning of the bank deposit statement. The truthful answer is that we cannot be *completely* certain, for we are not experts in banking practices. But, the Lewises's explanation is plausible; it is consistent with what we know of the commercial world; and, the government could easily have provided a counter-explanation, grounded in accounting or banking principles, were the Lewises's explanation wrong. The government failed even to advance a contrary argument.

If we put the matter in terms of "burdens of proof," the Lewises satisfied that burden, initially through testimony that would have proved sufficient had the IRS and the Tax Court read the bank deposit statement as reflecting ordinary banking activity; and, then, through a rehearing motion with a full, and uncontroverted, explanation of the statement. If we put the matter in practical terms, we recall Abraham Lincoln's famous question and reply. Lincoln asked his cabinet members, "How many legs would a sheep have if you call a tail a leg?" "Five," they answered. "Wrong," said Lincoln, "the answer is four; calling a tail a leg does not make it one."

In sum, the record here shows that Lewis explained the sources and amounts of ILT's income at trial. Nothing in the record suggests that his unrebutted testimony was "improbable, unreasonable, or [even] questionable," such that the Tax Court could choose to disregard it. *See Estate of DeNiro v. Commissioner*, 746 F.2d 327, 331 (6th Cir.1984) (citing *Commissioner v. Smith*, 285 F.2d 91, 96 (5th Cir.1960)). And, ILT's bank statement supports that testimony. ILT did *not* have "unexplained deposits . . . in the approximate amount of $4.5 million." Insofar as it rests upon this factual error, the Tax Court's finding that ILT had "earnings and profits" in 1984 sufficient to support a $2.159 million "dividend" distribution is "clearly erroneous."

## III

### *Proceedings on Remand*

Our conclusion about the facts of this case returns it to where we believe it should have begun. How, for tax purposes, should one characterize the funds that flowed to, and then through, ILT in 1984?

Some of those funds represent "interest" payments to ILT. The Lewises agree that they must pay income tax on the 1984 distribution to the extent that ILT received any such interest. But, those sums account for only a small part of the distribution. The more important part consists of ILT's receipt and subsequent return to Lewis and Belkin (through their "grantor" trusts) of the $2.159 million in sham loan proceeds.

The Tax Court seemed to find that this undisputed transfer of funds to ILT reflected possible ILT "earnings and profits," for it said that

Petitioners have failed to show . . . how a transfer between separate taxable entities, i.e., a transfer from petitioner and Belkin to ILT, would not be includable in ILT's taxable income or in ILT's earnings and profits.

But, the question at issue here is not factual; it is *legal*. The Lewises did show, and indeed, the Tax Court acknowledged, what the transfer consisted of, as a matter of *fact*. It consisted of an effort by Lewis and Belkin to send themselves some money in the manner described in Part I of this opinion, namely, by repaying "loans" obtained from ILT several years before, and flowing the repayment through ILT to themselves (in the form of their "grantor" trusts). The Lewises themselves now concede that the original "loans" were shams. They now dispute, not the facts, but how to characterize them as a legal matter. That is, they deny the Commissioner's legal right to tax in 1984 money that should have been taxed earlier, in now-closed years.

The law either does, or does not, permit the government to tax this money now. The taxpayer has no greater burden of "proving" the law than does the Commissioner, or, for that matter, the courts. Our problem is that neither the Tax Court, nor

the Commissioner, seems thoroughly to have considered a portion of the law that may answer the legal question. Our own research has led us to conclude that a type of estoppel known as "quasi estoppel" or the "duty of consistency" *might* operate in a way as to prevent the Lewises from denying the taxability, in 1984, of the $1,062,500 distribution. This "duty of consistency" prevents a taxpayer who has already had the advantage of a past misrepresentation—in a year now closed to review by the government—from changing his position and, by claiming he should have paid more tax before, avoiding the present tax. *See Beltzer v. United States,* 495 F.2d 211, 212–13 (8th Cir.1974).

■■■ The "duty of consistency" seems to apply when the earlier taxpayer position amounts to a misstatement of fact, not of law. *See, e.g., Herrington v. Commissioner,* 854 F.2d 755, 758 (5th Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989); *Beltzer,* 495 F.2d at 213; *Mayfair Minerals, Inc. v. Commissioner,* 456 F.2d 622, 623 (5th Cir.1972); *Crosley Corp. v. United States,* 229 F.2d 376, 380 (6th Cir. 1956); *Ross v. Commissioner,* 169 F.2d 483, 496 (1st Cir.1948) (simple failure to report income "is not a representation that such income has in fact not been received" and does not, without more, furnish grounds for estoppel); *Mertens, supra,* § 60.05 ("Where there is a mistake of law and no factual misrepresentations, the doctrine of consistency does not apply."). Moreover, the misstatement must be one on which the government reasonably relied, in the sense that it neither knew, nor ought to have known, the true nature of the transaction mischaracterized by the taxpayer. *See Herrington,* 854 F.2d at 758; *Mayfair Minerals,* 456 F.2d at 623; *Ross,* 169 F.2d at 495–96.

In this case, it seems possible that Lewis made representations of key facts regarding the genuine business activities of ILT throughout the 1970's and the genuine intent on his and Belkin's part to repay the ILT "loans." If such representations of fact were made, then holding Lewis to them now might generate a 1984 tax liability.

We stress, however, that we are uncertain about this matter. Since it has not been argued here, and since factual history is at issue, both the Lewises and the Commissioner should have a full opportunity to argue the issue before the Tax Court. We therefore vacate the Tax Court's judgment insofar as it is inconsistent with this opinion. And, we remand the case to the Tax Court for further proceedings.

*So ordered.*

APPENDIX

US$

INTERNATIONAL LOCAL TOURS

GEN. LEDGER

B84  | 0 | b | 3 | c |

CURRENT ACCOUNT

| DATE | PARTICULARS | DEBIT | CREDIT | BALANCE |
|------|-------------|-------|--------|---------|
| 31DEC80 | B.FWD | | | .( |
| 31DEC80 | TO C314 FOR FEES | 1,500.00- | | 1,500.( |
| 21JAN81 | 31/12 BY DEPOSIT A/C | | 5,000.00 | 3,500.( |
| 05FEB81 | CONTRA ENTRY 31/12 | | 1,500.00 | 5,030.( |
| 05FEB81 | CONTRA ENTRY 21/1 | 5,000.00- | | .( |
| 18MAR81 | INT ON LOAN TO MIDO CAP | | | |
| | VENTURE CO | | 51,508.50 | 51,508.5 |
| 06APR81 | TO CALL D/A | 50,000.00- | | 1,508.( |
| 31MAY81 | | | | 1,508. |
| 03JUN81 | FROM CALL | | 3,000.00 | 4,508. |
| 03JUN81 | 1/2 YRLY PAYT TO GRAN | | | |
| | CUMPANIE UNDER AGREEMENT | | | |
| | DATED 14/11/75 | 3,750.00- | | .758. |
| 24AUG81 | CONTRA ENTRY 6/4/81 | | 50,000.00 | 50,758. |
| 24AUG81 | CONTRA ENTRY 3/6/81 | | 3,750.00 | 54,508. |
| 24AUG81 | CONTRA ENTRY 18/6/81 | 51,508.50- | | 3,000. |
| 24AUG81 | CONTRA ENTRY 3/6/81 | 3,000.00- | | . |
| 13MAY82 | BANQUE BRUXELLES LAMBERT | | | |
| | TO CLOSE A/C | | 47.03 | 47. |
| 19MAY82 | TO CLOSE A/C DRESDNER BK | 12.35- | | 34. |
| 14JAN83 | 1/2 YRLY PYT TO G.C. | 3,750.00- | | 3,715. |
| 14JAN83 | 1/2 YRLY PYT TO G.C. | 3,750.00- | | 7,465. |
| 18JAN83 | 14/1 PER CALL DEP | | 8,000.00 | 534.( |
| 24JAN83 | CITCO FEES | 625.00- | | 90. |
| 24JAN83 | AGL FEE | 580.00- | | 670. |
| 27JAN83 | 24/1 PER DEPOSIT | | 3,000.00 | 2,329. |
| 06APR83 | B/O MIGROS BANK | | 45,785.00 | 48,114. |
| 06APR83 | TO CALL | 45,000.00- | | 3,114. |
| 13MAY83 | FROM GRAN COMPANIA | | 75,250.00 | 78,364. |
| 13MAY83 | FROM CALL | | 77,066.40 | 155,431. |
| 13MAY83 | INT DIV | *150,000.00- | | 5,431. |
| 31MAY83 | PER DEP | | 546.99 | 5,978. |

n Account With

CAYMAN INTERNATIONAL TRUST
COMPANY LIMITED

Cayman International Trust Building,
P. O. Box 500,
Grand Cayman,
Cayman Islands,
B. W. I.

KEY TO SYMBOLS
CA — Credit Advice
CC — Correspondents Charge
DA — Debit Advice
DIV — Dividend
DR — Overdraft
IF — Investment Fee
INT — Interest
MF — Management Fee
RE — Reversing Entry
SO — Standing Order
TF — Trustee Fee

All entries appearing on this statement are subject to addition, correction and reversal by the Bank. This Statement will be considered correct unle
xceptions are reported within 30 days from date of mailing. All correspondence should be addressed to the Manager and marked "Private a
confidential".

In Account With

# CAYMAN INTERNATIONAL TRUST COMPANY LIMITED

P O Box 500
Grand Cayman, B.W.I

INTERNATIONAL LOCAL TOURS LTD

REF: FG3140/003050

PAGE 1
ISSUED TO 30 SEP 83
ACCOUNT OFFICER 209
TYPE CURRENT
CURRENCY US$

| PARTICULARS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| BROUGHT FORWARD BALANCE | | | | 0.00 |
| OPENING BALANCE TFRD | | 5,978.07 | 1JUNE3 | 5,978.07 |
| 1/2YRLY FEE DUE TO GRANN COMPANIA - FG3710 | 3,750.00 | | 6JUNE3 | 2,228.07 |
| PER GRAN COMPANIA | | 112,875.00 | 15JUNE3 | 115,103.07 |
| CITCO FEES | 2,089.00 | | 26JUNE3 | 113,014.07 |
| TO FIXED DEPOSIT REF NO 005050/100003 | 113,000.00 | | 20JUL83 | 14.07 |
| TO F/D | 100,000.00 | | 24AUG83 | 99,985.93 00 |
| FROM FIXED DEPOSIT REF NO 005050/100002 | | 100,000.00 | 24AUG83 | 14.07 |
| FROM FIXED DEPOSIT 100003 CITCO | | 113,000.00 | 22AUG83 | 113,014.07 |
| INTEREST ON DEPOSIT 100003 CITCO | | 971.09 | 22AUG83 | 113,985.16 |

In Account With
# CAYMAN INTERNATIONAL TRUST COMPANY LIMITED
P.O Box 500
Grand Cayman, B.W.I.

PAGE 2
ISSUED TO 30 SEP 83
ACCOUNT OFFICER 209
TYPE    CURRENT
CURRENCY    US$

INTERNATIONAL LOCAL TOURS LTD

REF: F05140/0G3050

| PARTICULARS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| TO FIXED DEPOSIT REF NO 005050/100004 | 113,971.10 | | 22AUG83 | 14.06 |
| FROM FIXED DEPOSIT 100002 CITCO | | 0.00 | 2SEP83 | 14.06 |
| INTEREST ON DEPOSIT 100002 CITCO | | 242.19 | 2SEP83 | 256.25 |
| INTEREST ON DEPOSIT F05140 | | 242.19 | 15SEP83 | 498.44 |
| R/E 2/9 CR IN ERROR | 242.19 | | 16SEP83 | 256.25 |
| R/E 15/9 CR IN ERROR | 242.19 | | 16SEP83 | 14.06 |
| FROM FIXED DEPOSIT 100004 CITCO | | 113,971.10 | 22SEP83 | 113,985.16 |
| INTEREST ON DEPOSIT 100004 CITCO | | 920.08 | 22SEP83 | 114,905.24 |
| TO FIXED DEPOSIT REF NO 005050/100005 | 110,000.00 | | 22SEP83 | 4,905.24 |
| CARRIED FORWARD BALANCE | | | | 4,905.24 |

In Account With
# CAYMAN INTERNATIONAL TRUST COMPANY LIMITED
P O Box 500
Grand Cayman BWI

INTERNATIONAL LOCAL TOURS LTD

PAGE 4
ISSUED TO 28 SEP 84
ACCOUNT OFFICER 209
TYPE E CURRENT
CURRENCY US$

REF: F0314C/003050

| PARTICULARS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| BROUGHT FORWARD BALANCE | | | 30SEP83 | 4,905.24 |
| FROM ILT | | 112,875.00 | 27OCT83 | 117,780.24 |
| MIDO CAPITAL VENTURE | | 51,508.50 | 4NOV83 | 169,288.74 |
| TO FIXED DEPOSIT REF NO 005050/100006 | 110,000.00 | | 7NOV83 | 59,288.74 |
| FROM FIXED DEPOSIT 100006 CITCO | | 110,000.00 | 7DEC83 | 169,288.74 |
| INTEREST ON DEPOSIT 100006 CITCO | | 830.73 | 7DEC83 | 170,119.47 |
| TO FIXED DEPOSIT REF NO 005050/100007 | 110,830.00 | | 7DEC83 | 59,289.47 |
| FROM FIXED DEPOSIT 100005 CITCO | | 110,000.00 | 22DEC83 | 169,289.47 |
| INTEREST ON DEPOSIT 100005 CITCO | | 2,606.77 | 22DEC83 | 171,896.24 |
| FROM FIXED DEPOSIT 100007 CITCO | | 110,830.00 | 6JAN84 | 292,726.24 |

31

**In Account With**
## CAYMAN INTERNATIONAL TRUST COMPANY LIMITED
PO Box 500
Grand Cayman, BWI

PAGE 5
ISSUED TO 28 SEP 84
ACCOUNT OFFICER 209
TYPE CURRENT
CURRENCY US$

INTERNATIONAL LOCAL TOURS LTD

REF: F03140/003050

| PARTICULARS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| INTEREST ON DEPOSIT 100007 CITCO | | 860.09 | 6JAN84 | 285,586.33 |
| TO FIXED DEPOSIT REF NO 005050/100008 | 280,000.00 | | 6JAN84 | 3,586.33 |
| FROM FIXED DEPOSIT 100008 CITCO | | 280,000.00 | 6FEB84 | 283,586.33 |
| INTEREST ON DEPOSIT 100008 CITCO | | 2,230.27 | 6FEB84 | 285,816.60 |
| TO FIXED DEPOSIT REF NO 005050/100009 | 280,000.00 | | 6FEB84 | 5,816.60 |
| FROM FIXED DEPOSIT REF NO 005050/100009 | | 280,000.00 | 7FEB84 | 285,816.60 |
| CITCO MAN FEES/DISB'MTS | 3,790.00 | | 7FEB84 | 282,026.60 |
| (DIVD TO RJ HARRIS SETT | 275,000.00 | | 8FEB84 | 7,026.60 |
| FROM IRVING TRUST CO B/O MOGROS BK ZURICH RE MIDO | | 17,169.50 | 1MAR84 | 24,196.10 |
| FROM GRAN COMPANIA | | 37,625.00 | 14MAR84 | 61,821.10 |

In Account With
## CAYMAN INTERNATIONAL TRUST COMPANY LIMITED

P O Box 500.
Grand Cayman. B W I

INTERNATIONAL LOCAL TOURS LTD     E

PAGE     6
ISSUED TO 28 SEP 84
ACCOUNT OFFICER 209
TYPE     CURRENT
CURRENCY     US$

REF: F03140/003050

| PARTICULARS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| TO CALL DEPOSIT | 40,000.00 | | 23MAR84 | 21,821.10 |
| * DIV ON RW HARRIS SETT | * 9,600.00 ✓ | | 26MAR84 | 12,221.10 |
| FROM CALL DEPOSIT | | 6,000.00 | 26MAR84 | 18,221.10 |
| TO CALL DEPOSIT | | 1,415,000.00 | 26APR84 | 1,433,221.10 |
| R/E ABOVE | 1,415,000.00 | | 20APR84 | 18,221.10 |
| TO CALL DEPOSIT | 1,415,000.00 | | 25APR84 | 1,396,778.90 OD |
| FROM GRAN COMPANIA | | 1,430,000.00 | 25APR84 | 3,221.10 |
| LOAN INT - GRAN COMPANIA | | 11,940.36 | 26APR84 | 15,161.46 |
| TO CALL DEPOSIT REF NO 004050/001001 | 12,000.00 | | 7MAY84 | 3,161.46 |
| * DIV TO RW HARRIS SETT | * 1,450,000.00 ✓ | | 9MAY84 | 1,446,838.54 OD |

In Account With
## CAYMAN INTERNATIONAL TRUST COMPANY LIMITED
P O Box 500,
Grand Cayman, B W I

INTERNATIONAL LOCAL TOURS LTD

REF: F03140/003050

PAGE 7
ISSUED TO 26 SEP 84
ACCOUNT OFFICER 209
TYPE CURRENT
CURRENCY US$

| PARTICULARS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| FROM CALL DEPOSIT | | 1,450,000.00 | 9MAY84 | 3,161.46 |
| CITCO MAN FEES/DISB'MTS | 1,394.00 | | 16MAY84 | 1,767.46 |
| CITCO MAN FEES/DISB'MTS | 580.00 | | 24MAY84 | 1,187.46 |
| FROM GRAN COMPANIA RE WINDIKIP | | 37,625.00 | 25MAY84 | 36,812.46 |
| TO CALL DEPOSIT | 35,000.00 | | 28MAY84 | 3,812.46 |
| CITCO MAN FEES/DISB'MTS | 9.00 | | 31MAY84 | 3,803.46 |
| QUARTERLY CALL INTEREST 004050 - 001001 | | 3,391.09 | 31MAY84 | 7,194.55 |
| TO CALL DEPOSIT | 5,000.00 | | 22JUN84 | 2,194.55 |
| FROM CALL DEPOSIT REF NO 004050/001001 | | 36,000.00 | 22JUN84 | 38,194.55 |
| I/E 25MAY84 | 37,625.00 | | 22JUN84 | 569.55 |

**In Account With**

**CAYMAN INTERNATIONAL TRUST COMPANY LIMITED**

P.O. Box 500,
Grand Cayman. B W I

PAGE                    8

ISSUED TO 28 SEP 84

ACCOUNT OFFICER 209

| | TYPE | CURRENT |
| | CURRENCY | US$ |

INTERNATIONAL LOCAL TOURS LTD          E

REF: F03140/003050

| PARTICULARS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| LOAN REPAYT MIDO CAP VENT | | 5,723.15 | 16AUG84 | 6,292.70 |
| QUARTERLY CALL INTEREST 004050 - 001001 | | 401.66 | 31AUG84 | 6,694.36 |
| TO CALL DEPOSIT REF NO 004050/001001 | 5,000.00 | | 7SEP94 | 1,694.36 |
| CARRIED FORWARD BALANCE | | | | 1,694.35 |

CAYMAN INTERNATIONAL TRUST COMPANY LIMITED
P.C. Box 500
Grand Cayman BWI

INTERNATIONAL LOCAL TOURS LTD

REF: FO3140/003050

PAGE 9
ISSUED TO 30 SEP 85
ACCOUNT OFFICER 209
TYPE CURRENT
CURRENCY US$

| PRINCIPAL | WITHDRAWALS | DEPOSIT | DATE | BALANCE |
|---|---|---|---|---|
| BROUGHT FORWARD BALANCE | | | 28SEP84 | 1,694.36 |
| AMOUNT RECD PER MIDO CAP | | 708,658.50 | 20NOV84 | 710,352.85 |
| DIV ON RW HARRIS SETT | 708,658.50 | | 21NOV84 | 1,694.36 |
| MIDO CAPITAL FUNDS REC'D | | 17,169.50 | 28NOV84 | 18,863.86 |
| TO CALL DEPOSIT | 15,000.00 | | 29NOV84 | 3,863.86 |
| QUARTERLY CALL INTEREST G04050 - 001001 | | 325.59 | 30NOV84 | 4,189.45 |
| CITCO MAN FEES/DISB'MTS | 3,355.40 | | 12DEC84 | 834.05 |
| QUARTERLY CALL INTEREST C0405G - 001001 | | 416.11 | 28FEB85 | 1,250.16 |
| FROM CALL DEPOSIT | | 35,000.00 | 23APR85 | 36,250.16 |
| DIV PAYT TO N331 | 27,500.00 | | 24APR85 | 8,750.16 |

In Account With  ( )
**CAYMAN INTERNATIONAL TRUST
COMPANY LIMITED**

P O Box 500
Grand Cayman B W I

PAGE               10

ISSUED TO 30 SEP. 85

ACCOUNT OFFICER 2C9

INTERNATIONAL LOCAL TCURS LTD          E

TYPE      CURRENT

CURRENCY      US$

REF: F0314D/CC3050

| PARTICULARS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| QUARTERLY CALL INTEREST<br>004050 - 001CC1 | | 236.25 | 31MAY85 | 8,986.41 |
| CARRIED FORWARD BALANCE | | | | 8,986.41 |

In Account With

**CAYMAN INTERNATIONAL TRUST COMPANY LIMITED**

P C Bo> 500
Grand Cayman, BWI

PAGE 11
ISSUED TO 30 SEP 96
ACCOUNT OFFICER 309
TYPE CURRENT
CURRENCY USD

INTERNATIONAL LOCAL TOURS LTD

REF: F00143/003050

| DETAILS | WITHDRAWALS | DEPOSITS | DATE | BALANCE |
|---|---|---|---|---|
| BROUGHT FORWARD BALANCE | | | 30SEP95 | 5,956.41 |
| CITCO MAN FEES/DISB'MTS | 2,754.00 | | 12DEC95 | 5,232.41 |
| CARRIED FORWARD BALANCE | | | | 5,232.41 |

```
                                                          PAGE        12

                                                          ISSUED TO 3C SEP 87

                                                          ACCOUNT OFFICER 309

INTERNATIONAL LOCAL TOURS LTD              E              TYPE      CURRENT

REF: FC314C/003C5C                                        CURRENCY    USD

BROUGHT FORWARD BALANCE                          3CSEP86    6,232.41

CITCO MAN FEES/DISB'MTS            2,580.40      9FEB87     3,652.C1

LOAN TO N351                      2,500.0C      16FEB87     1,152.C1

CARRIED FORWARD BALANCE                                     1,152.C1
```

PAGE 1?

ISSUED TO 24 MAR 89

ACCOUNT OFFICER 309

| TYPE | CURRENT |
| CURRENCY | USD |

INTERNATIONAL LOCAL TOURS LTD

REF: FC3140/003050

| | | CURRENCY | |
| --- | --- | --- | --- |
| BROUGHT FORWARD BALANCE | | 30SEP87 | 1,152.01 |
| LOAN FROM SHAREHOLDER | 5,000.00 | 2DEC87 | 6,152.01 |
| ITCO MAN FEES/DISB'MTS | 5,027.48 | 9MAR88 | 1,124.53 |
| CARRIED FORWARD BALANCE | | | 1,124.53 |