MICHAEL AND JEANNE A. DOGALI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dogali v. Commissioner
Docket Nos. 3405-92, 24906-92
United States Tax Court
T.C. Memo 1995-39; 1995 Tax Ct. Memo LEXIS 54; 69 T.C.M. (CCH) 1759; January 30, 1995, Filed *54 Decisions will be entered under Rule 155. Petitioner husband (P), a neurosurgeon, was employed by Dr. S. Dr. S subsequently incorporated his practice and named it N. Corp. P and others purchased control of N Corp. from Dr. S. Each buyer purchased one share; the remaining shares were redeemed by N Corp. N Corp. gave Dr. S cash and a promissory note (the note) in consideration for the stock redeemed. P guaranteed a portion of the note. N Corp. entered into an employment agreement with Dr. S (the S agreement). P guaranteed a portion of the payments to be made under the S agreement. P left the employ of N Corp. and formed his own professional corporation, D Corp. Dr. S sued P and D Corp., among others claiming breaches of the agreement on the note and under the S agreement and for tortious interference with Dr. S' medical practice. D Corp. subsequently settled the suit brought by Dr. S. P claimed a $ 350,000 settlement payment as a deduction under sec. 162(a), I.R.C. R disallowed the deduction and imposed additions to tax under secs. 6653(a) and 6661, I.R.C.
1. Held: R's determination that the settlement payment is not an "ordinary and necessary expense" of P's business *55 under sec. 162(a), I.R.C., is sustained. 2. Held, further, R's imposition of additions to tax under secs. 6653(a) and 6661, I.R.C., is sustained. For petitioners: Richard S. Kestenbaum and Bernard S. Mark. For respondent: Halvor N. Adams III. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: These two cases have been consolidated for trial, briefing, and opinion. Respondent has determined deficiencies in income tax and additions to tax as follows: Additions to Tax
Sec.
Sec. Sec. Sec.
Year
Deficiency
6653(a)(1)
6653(a)(1)(A)
6653(a)(1)(B)
6661
1987
$  3,387
-  $ 169 *
-  1988
108,501
$ 5,425
-  -
$ 27,125
* 50% of the interest due on the amount of the deficiency.
All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. The parties have filed a stipulation of settled issues, which is accepted by the Court. The issues remaining for decision are: (1) petitioners' entitlement to a deduction for a "litigation settlement expense" and (2) the additions to tax. *56 FINDINGS OF FACT Introduction
Some facts have been stipulated and are so found. The stipulations of facts filed by the parties and accompanying exhibits are incorporated herein by this reference. Petitioners Michael and Jeanne A. Dogali are husband and wife. (Hereafter, when used in the singular, the term "petitioner" will be used to refer to petitioner Michael Dogali.) They made joint returns of Federal income tax for the years in issue. Petitioners resided in Connecticut at the time they filed the petitions herein. Petitioner's Relationship with Sherman
Petitioner is a neurosurgeon. In 1976, upon completion of his neurosurgical training, petitioner entered the employ of Dr. Irving Sherman (Sherman), a neurosurgeon with an established practice in Connecticut. Petitioner's agreement of employment was with Sherman directly; it was not with any professional corporation. The term of petitioner's employment agreement (the Dogali-Sherman Agreement) was 10 years. Among other things, the Dogali-Sherman Agreement provided that, if petitioner left the employ of Sherman, petitioner had to move at least 50 miles away to practice. Sherman also employed other neurosurgeons, *57 Drs. Yu, Nijensohn, and Dila. Purchase of NSPC from Sherman
Sometime between 1976 and 1979, Sherman incorporated his practice and named it Neurological Surgeons, P.C. (NSPC). In December 1979, petitioner and Drs. Yu, Nijensohn, and Dila, agreed to purchase control of NSPC from Sherman. They did so pursuant to an agreement dated December 5, 1979 (the Purchase Agreement). There were 100 shares of NSPC stock outstanding at that time. Sherman owned all of those shares. In accordance with the Purchase Agreement, each of the doctors purchased one share at a price of $ 6,800 a share. NSPC redeemed the remaining 96 shares from Sherman for $ 6,800 a share. In consideration for Sherman's 96 shares, NSPC paid Sherman $ 3,985 in cash and gave him a promissory note (the Promissory Note) in the principal amount of $ 648,815. Petitioner executed an agreement guaranteeing the payment of one-quarter of the Promissory Note. Subsequently, petitioner's share of the guarantee increased to one-third. The Sherman-NSPC Agreement
Also on December 5, 1979, NSPC and Sherman entered into an agreement of employment (the Sherman-NSPC Agreement) whereby NSPC agreed to employ Sherman for *58 a period of approximately 8 years. Petitioner guaranteed one-quarter of the payments that NSPC was obligated to make to Sherman under the Sherman-NSPC Agreement. Subsequently, petitioner's share of the guarantee increased to one-third. Petitioner's Employment by and Departure from NSPC
Petitioner entered into an agreement of employment with NSPC on December 5, 1979 (the Dogali-NSPC Agreement). The Dogali-NSPC Agreement contained a clause prohibiting petitioner's competition with NSPC within the Bridgeport area prior to November 30, 1987, should petitioner leave the employ of NSPC under certain conditions. On April 19, 1982, petitioner left the employ of NSPC. NSPC and petitioner entered into a severance agreement. Connecticut Neurological Surgeons, P.C.
Sometime prior to April 1982, petitioner had formed a Connecticut professional corporation, Michael Dogali, M.D., P.C., which, subsequently, changed its name to Connecticut Neurological Surgeons, P.C. (We will refer to both corporations, without discrimination, as Dogali, P.C.) Sherman's Suit; Nijensohn's Cross-Suit
On October 23, 1985, Sherman sued petitioner, NSPC, and five other parties, by filing a *59 civil complaint in Connecticut Superior Court, Judicial District of Fairfield at Bridgeport (the Superior Court). At that time, NSPC was a defunct corporation. On June 28, 1988, Sherman filed a substituted complaint (the substituted complaint) against NSPC, petitioner, Dogali, P.C., Nijensohn, Nijensohn, P.C., and others. Counts 1, 3, and 4 of the substituted complaint are against petitioner, Dogali, P.C., and others. Counts 1, 3, and 4 allege a breach of the Sherman-NSPC Agreement. Count 6 of the substituted complaint is against petitioner and Dogali, P.C. Count 6 alleges that petitioner breached his guarantee of the Sherman-NSPC Agreement. Count 7 of the substituted complaint is against petitioner, Dogali, P.C., and others. Count 7 alleges tortious interference with Sherman's medical practice. Counts 8, 9, and 11 of the substituted complaint allege that petitioner, Nijensohn, and their professional corporations (1) took actions that prevented NSPC from meeting its contractual commitments to Sherman, (2) violated NSPC's employment contract with Sherman by failing to refer to him hospital consultations and referrals and by failing to pass to him his patients, and (3) breached *60 their respective guarantees of the amount due Sherman from NSPC under the Promissory Note. In October 1986, the Superior Court ordered prejudgment remedies against Nijensohn and petitioner of $ 500,000 and $ 300,000, respectively. In February 1987, the Superior Court issued a $ 300,000 writ of attachment in favor of Sherman against petitioner's home to cover the prejudgment remedy if necessary. Nijensohn and Nijensohn, P.C., filed a cross-complaint against petitioner and Dogali, P.C. The Escrow Agreement
In February 1987, petitioner, Dogali, P.C., Sherman, and petitioner's attorney, William B. Rush (as escrow agent), entered an escrow agreement (the Escrow Agreement). The funds deposited into escrow (the Escrow Fund) were to serve as partial security for the satisfaction of any final judgment against petitioner and Dogali, P.C. Of the $ 440,000 deposited into the Escrow Fund, petitioner contributed $ 40,000 and Dogali, P.C., contributed the remaining $ 400,000. Settlement of the Suit
In September 1988, Sherman and petitioner, both individually and as president of Dogali, P.C., entered into an agreement to settle the suit brought by Sherman (the Settlement Agreement). *61 Among the terms of the Settlement Agreement, petitioner, on behalf of himself and Dogali, P.C., agreed to pay to Sherman $ 550,000. Petitioner also reached an agreement with Nijensohn to settle the cross-complaint made by him. Nijensohn was to receive $ 200,000 on behalf of petitioner and Dogali, P.C. In discharge of the obligation of petitioner and Dogali P.C. to Sherman under the Settlement Agreement, Sherman received a total of $ 550,000, of which $ 310,000 was paid by petitioner and $ 240,000 was paid from the Escrow Fund. Nijensohn was paid $ 200,000 from the Escrow Fund. Petitioner's payments to (1) the Escrow Fund and (2) Sherman totaled $ 350,000. Petitioner's Sale of Dogali, P.C.
By an agreement entered into in August 1988 (the Sales Agreement), petitioner agreed to sell the stock of Dogali, P.C., to Drs. Lipow and Stanciu. Petitioner owned all of the issued and outstanding shares of stock of Dogali, P.C. As consideration for the sale of that stock, Drs. Lipow and Stanciu agreed, among other things, to (1) deliver to petitioner a release from his guarantee of a $ 1,000,000 bank loan to Dogali, P.C., (2) release petitioner from any other guarantees of loans *62 to Dogali, P.C., and (3) guarantee the payment to petitioner of $ 250,000 severance due him from Dogali, P.C. The Sales Agreement contemplated the settlement of the suit brought by Sherman. If, after resolution of the Sherman suit, any funds remained in the Escrow Fund, they were to be shared equally by petitioner and Dogali, P.C. Petitioner sold his shares in Dogali, P.C., because he wished to leave his medical practice in Connecticut and take a job in academic medicine at New York University. Preparation of Petitioners' Federal Income Tax Returns
James Woods (Woods), an accountant, prepared petitioners' joint Federal income tax returns for 1987 and 1988. Woods prepared the returns based on information provided by petitioners and their attorney. OPINION The issues remaining for decision are (1) petitioners' entitlement to a deduction under section 162(a) for a "litigation settlement expense", (2) additions to tax for negligence under section 6653, and (3) an addition to tax for substantial understatement of liability under section 6661. I. "litigation settlement expense"
a. Introduction
We are concerned here with certain payments made in settlement of *63 a lawsuit brought against petitioner, his professional corporation, Dogali, P.C., and certain others by Dr. Irving Sherman (Sherman). Settlements were reached by petitioner and Dogali, P.C., with Sherman and a cross-complainant, Dr. Daniel E. Nijensohn (Nijensohn). Pursuant to a settlement agreement with Sherman (the Settlement Agreement), petitioner, on behalf of himself and Dogali, P.C., agreed to pay Sherman $ 550,000. Petitioner and Dogali, P.C., also agreed to pay Nijensohn $ 200,000. The total amount paid to Sherman and Nijensohn was $ 750,000. Of that amount, $ 440,000 was paid from an escrow fund (Escrow Fund) to which (1) petitioner had contributed $ 40,000 and (2) Dogali, P.C., had contributed $ 400,000. Petitioner paid $ 310,000 directly to Sherman. Petitioner's payments, directly and indirectly, totaled $ 350,000, and we have so found. Petitioners claim a deduction in that amount under section 162(a) as an ordinary and necessary expense incurred during 1988 in carrying on petitioner's trade or business of being an employee of Sherman's. Respondent argues that a deduction under section 162(a) is not allowable because petitioners have failed to carry their burden *64 of proving that (1) any portion of petitioner's payment was made on his own behalf (and that all of the payment was not made on behalf of Dogali, P.C.) and (2) even if some portion of that payment was made on petitioner's own behalf, any portion of the payment was an ordinary and necessary expense of petitioner's trade or business of being an employee of Sherman's. Respondent argues further: If we find that any portion of petitioner's payment was made on his own behalf, that portion was paid pursuant to petitioner's guarantees of NSPC's obligations to Sherman. Petitioner's guarantee payments created a debt from NSPC to petitioner. That debt, if it gives rise to a deduction at all, only gives rise to a bad debt deduction under section 166. Section 166 allows a deduction only for the year during which petitioners can show the debt became worthless. Petitioners have failed to prove that such debt became worthless in the years at issue. Consequently, petitioners are not able to deduct the payments as a bad debt under section 166. b. Whether Payments Were Made on Behalf of Petitioner or Dogali, Inc.
1. Section 162
Pursuant to section 162, a deduction is allowed for "all *65 the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". 2. Payments on Behalf of a Corporation
"In order to be deductible, business expenses generally must be the expenses of the taxpayer claiming the deduction." Gantner v. Commissioner, 91 T.C. 713, 725 (1988), affd. 905 F.2d 241 (8th Cir. 1990). See Hewett v. Commissioner, 47 T.C. 483, 488 (1967). For tax purposes, a corporation is treated as a separate entity from its shareholders. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). Ordinarily, a shareholder may not deduct a payment made on behalf of the corporation, but must treat it as a capital expenditure. Deputy v. DuPont, 308 U.S. 488 (1940); Rand v. Commissioner, 35 T.C. 956 (1961). However, such rule is not invariable; the payment may be deducted if it is an ordinary and necessary expense of a trade or business of the shareholder. [Gould v. Commissioner, 64 T.C. 132, 134-135 (1975).] *66 Thus, for instance, a shareholder who pays corporate expenses in order to preserve his employment may deduct the payment under section 162(a). Cf. Gould v. Commissioner, supra (shareholder made payments for benefit of one corporation to preserve his job at another). Petitioner bears the burden of proving that the payment constitutes an ordinary and necessary expense incurred in his trade or business. Rule 142(a). 3. If Paid on Behalf of Dogali, P.C.
By an agreement entered into in August 1988 (the Sales Agreement), petitioner agreed to sell the stock of Dogali, P.C. Petitioner sold his shares in Dogali, P.C., because he wished to leave his medical practice in Connecticut and take a job in academic medicine at New York University. The Sales Agreement contemplated the settlement of the suit brought by Sherman. It seems clear to us that, to the extent that petitioner made a payment on behalf of Dogali, P.C., he did so to enhance the value of his shares in Dogali, P.C. He did not do so to preserve his employment with Dogali, P.C., since he had decided to leave the practice of medicine in Connecticut. To the extent that petitioner *67 made a payment on behalf of Dogali, P.C., petitioner has not carried his burden of proof that such expenditure constituted an ordinary and necessary expense incurred in his trade or business. To that extent, we hold that no deduction under section 162(a) is allowed. 4. What Portion Paid on Behalf of Dogali, P.C.
In settlement of the lawsuit brought by Sherman, $ 750,000 was paid to Sherman and Nijensohn ($ 550,000 to Sherman and $ 200,000 to Nijensohn). The payments were made on behalf of both petitioner and Dogali, P.C. Petitioner bears the burden of proving that portion of his payment that was not made on behalf of Dogali, P.C. Petitioners have proposed as a finding of fact the following: Of the $ 350,000.00 that was, in fact, paid by Dr. Dogali, $ 200,000.00 was paid with respect to his absolute guarantees and $ 150,000.00 was paid with respect to Dr. Dogali's alleged tortious interference with Dr. Sherman's contractual and financial expectations with regard to monies Dr. Sherman was to earn respecting Drs. Stanciu and Lipow, who worked with Dr. Dogali. * * * [Pet's' brief at 9.]
In support of that finding, petitioners cite the substituted complaint made by *68 Sherman in his suit, the Settlement Agreement, a release executed by Sherman, and certain testimony of petitioner. None of the three documents cited establish what portion of the payment was made on petitioner's own behalf and what portion was made on behalf of Dogali, P.C. Petitioner's testimony establishes only that he paid $ 350,000 of the $ 750,000 settlement. He admitted that he did not "remember all the exact details", but thought that he paid $ 150,000 relating to Drs. Stanciu and Lipow and $ 200,000 relating to the guarantees he had made. Without more, we simply will not accept petitioner's self-serving testimony as establishing the portion of the settlement payment that is attributable to a settlement of petitioner's liability rather than Dogali, P.C.'s, liability. It must be remembered that petitioner owned all of Dogali, P.C.'s shares, and settlement of the Sherman lawsuit was contemplated in the agreement to sell the corporation. Petitioner's payment of Dogali, P.C.'s, liability benefitted petitioner no less economically than payment of his own liability. Petitioners have not carried their burden of showing what portion of the settlement payment is attributable *69 to a settlement of petitioner's liability. 5. No Need to Estimate
Nevertheless, we believe that some portion of the settlement payment was made in discharge of petitioner's own liability. In such cases, we can estimate, bearing heavily on petitioner, who bears the burden of proof on this issue. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). Were we convinced that such estimate would lead to any amount being deductible by petitioners, we would do so. However, because we believe that that would be a futile exercise, we will not do so. We believe that the exercise would be futile because, for reasons explained below, petitioner has not carried his burden of proving that any amount he paid in discharge of his own liability was an ordinary and necessary expense incurred during 1988 in carrying on petitioner's trade or business of being an employee of Sherman's. See sec. 162(a). C. Origin of the Claim Rule
1. Petitioners' Theory
Petitioners argue that, of the $ 350,000 paid by petitioner, $ 200,000 was paid with respect to the guarantees entered into by petitioner and $ 150,000 was paid with respect to the claim of *70 tortious interference. Petitioners suggest that, since we are dealing with the settlement of claims made in litigation, we look to the origin of the claims to determine whether the payments made in settlement thereof give rise to a deductible business expense. See United States v. Gilmore, 372 U.S. 39, 48 (1963); McDonald v. Commissioner, 592 F.2d 635 (2d Cir. 1978), revg. T.C. Memo. 1977-202. Petitioners argue: Under the facts of the subject case, the undisputed evidence overwhelmingly establishes that the "origin" of Dr. Sherman's claim was the establishment of Dr. Dogali's professional relationship with Dr. Sherman. This relationship was created prior to 1979 and was modified in 1979 pursuant to the 1979 Agreement [the Purchase Agreement], Dr. Dogali's Employment Agreement [the Dogali-NSPC Agreement] and his personal guarantees * * *. In this regard, the only way Dr. Dogali was able to continue employment in the Bridgeport area in 1979 was to sign the 1979 Agreement [the Purchase Agreement] and personal guarantees * * *. Otherwise, Dr. Sherman threatened to invoke the prior restrictive *71 covenant and sue Dr. Dogali if he should seek employment elsewhere * * *. [Pet's' brief at 17.]
In their reply brief, petitioners put their point most succinctly: Simply put, there is nothing in the record to even remotely suggest that Dr. Sherman's claim originated in connection with anything other than Dr. Dogali's profit-seeking activities of being an employee of Dr. Sherman prior to 1979. [Pet's' brief at 8.]
If we understand petitioners correctly, Sherman had obtained an agreement not to compete from petitioner when Sherman hired him in 1976. In 1979, to obtain relief from that agreement, petitioner entered into the Purchase Agreement (by way of which Sherman was bought out of NSPC), executed the two guarantees, and went to work for NSPC pursuant to the Dogali-NSPC Agreement (which itself contained an agreement not to compete, i.e., not to compete with NSPC). Petitioner's point, we guess, is that, in 1979, petitioner entered into the foregoing to buy out his 1976 noncompete agreement and, in 1988, when called to make good on his obligations, by way of the settlement payments, he should be given a deduction under section 162. 2. Analysis
Pursuant to the *72 Purchase Agreement, Sherman received $ 680,000 in cash and notes from NSPC, petitioner, and the other doctors in exchange for his shares in NSPC. He received the bulk of that compensation in notes, in redemption of his shares by NSPC. He received $ 6,800 from petitioner for one share of stock in NSPC. He also received a valuable employment contract from NSPC (the Sherman-NSPC Agreement). Petitioner ended up a one-quarter owner of NSPC, with guarantee obligations (1) on NSPC's notes to Sherman and (2) with respect to NSPC's employment contract with Sherman. Furthermore, petitioner was obligated to work for NSPC. For an immediate payment of $ 6,800, petitioner became an equity owner in NSPC. He also assumed a substantial risk by agreeing to guarantee certain obligations of NSPC. One possibility is that he entered into those guarantees to safeguard his capital investment. Another possibility is that petitioner entered into the guarantees because NSPC had overpaid for Sherman's stock and Sherman's employment contract as a way of obtaining petitioner's employment contract. The problem is that petitioner has failed to carry his burden of proving any theory that entitles him to *73 an ordinary income deduction. All we have is petitioner's testimony, which is not conclusive: Q: Why did you give those guarantees to Dr. Sherman? A: It was the only way that we were able to come to an agreement with Dr. Sherman to be able to not invoke the restrictive covenant. In other words, we wanted to go from his individual ownership to corporate ownership, and the only documents we had prior to this were these restrictive covenants. So we wanted to retire the restrictive covenants and form a corporation, and this was the only way he would agree to do that. [Tr. 24]
Petitioner ended up working for NSPC, under a contract that contained a covenant not to compete. Petitioner has not convinced us that he, and the other doctors, did not invest in NSPC to make a profit. NSPC either had acquired, or would acquire, their employment contracts from Dr. Sherman. Apparently, such medical corporations can be a valuable investment; witness the consideration received by petitioner on his sale of the stock of Dogali, P.C. We therefore conclude that petitioner's investment in NSPC was a capital investment. We need not and do not decide whether petitioner's guarantees of *74 NSPC's obligations, when he was called on them, and was unable to collect from NSPC, gave rise to a bad debt deduction (as respondent has argued). See sec. 166; sec. 1.166-9, Income Tax Regs.
With respect to the $ 150,000 that petitioners argue was paid with respect to the claim of tortious interference, some portion of that may have been paid in discharge of petitioner's own liability (and not that of Dogali, P.C.'s). As to the origin of the tortious interference claim, petitioners again argue that it originated in connection with his trade or business of being an employee: "There is nothing in the record to even remotely suggest that Dr. Sherman's claim originated in connection with anything other than Dr. Dogali's profit-seeking activity of being an employee of Dr. Sherman prior to 1979." Petitioners' brief 18; cf., petitioners' reply brief 8. We disagree. On the facts before us, it is possible that, to the extent that the claim had any merit whatsoever, it originated in connection with petitioner's actions in connection with his role as a shareholder of NSPC. Petitioners have failed to carry their burden of proving that petitioner's portion of the payment in question arose *75 in connection with his trade or business of being an employee of Sherman's prior to 1979. Compare Dancer v. Commissioner, 73 T.C. 1103 (1980) (settlement amount paid in connection with an automobile accident was a deductible business expense), with Freedman v. Commissioner, 35 T.C. 1179 (1961) (to the contrary; not engaged in a business activity when the accident occurred), affd. 301 F.2d 359 (5th Cir. 1962). Petitioner has failed to prove that, in 1988, in paying any amount to Sherman, he incurred an ordinary and necessary expense in carrying on his trade or business of being an employee of Sherman's. For that reason, we hold that he is entitled to no deduction on account thereof under section 162 and sustain respondent's determination of a deficiency to the extent it so relates. II. Additions to Tax Under Section 6653(a)
Respondent has determined that petitioners are liable for additions to tax under section 6653(a). Section 6653(a) imposes an addition to tax where the taxpayer's underpayment is due to negligence or intentional disregard of rules or regulations (hereinafter referred *76 to simply as negligence). Section 6653(a)(1), for returns due in 1989, and section 6653(a)(1)(A), for returns due in 1988, impose an addition to tax equal to 5 percent of the entire underpayment if any portion of such underpayment is due to negligence. Section 6653(a)(1)(B), for returns due in 1988, imposes an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment due to negligence. Respondent determined the entire underpayment for both 1987 and 1988 was due to negligence. "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). Petitioners bear the burden of proving that respondent's determination of an addition to tax for negligence is erroneous. Rule 142(a). Petitioners contend that, since they relied in good faith upon the advice of a competent and experienced accountant in the preparation of their return, the additions to tax for negligence are *77 not applicable. See Weis v. Commissioner, 94 T.C. 473, 487 (1990). "As a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer." Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). Nevertheless, this Court has declined to sustain the addition to tax under section 6653(a) in cases in which taxpayers have relied in good faith on the advice of tax experts. Id. and cases cited therein. In those cases, the reliance was with regard to complex transactions, and the position taken with respect to items had a reasonable basis. See Metra Chem Corp. v. Commissioner, supra at 662; Rosenthal Chiropractic Offices, Inc. v. Commissioner, T.C. Memo. 1993-331. Furthermore, to show a good faith reliance, "the taxpayer must establish that the return preparer was supplied with all necessary information and the incorrect return was a result of the preparer's mistakes." Weis v. Commissioner, supra at 487; see also Johnson v. Commissioner, 74 T.C. 89, 97 (1980), *78 affd. 673 F.2d 262 (9th Cir. 1982); Rosenthal Chiropractic Offices, Inc. v. Commissioner, supra.
Petitioners have failed to prove that they relied in good faith upon their accountant's advice. In addition to the litigation expense that we have determined that petitioners erroneously deducted, petitioners have conceded that their 1987 and 1988 Federal income tax returns contained multiple errors. Those errors include (1) improperly claimed dependency exemptions in both 1987 and 1988, (2) unreported interest income in 1987, (3) passive interest reported as investment interest in both 1987 and 1988, (4) improper deductions for personal use of income producing property in both 1987 and 1988, (5) a $ 75,000 overstatement of basis of an asset sold in 1988, and (6) the failure to report the 10-percent additional tax due on the distribution from petitioner's qualified retirement plan in 1988. The errors found in petitioners' 1987 and 1988 tax returns were due to petitioners' failure adequately to inform their income tax return preparer. Petitioners' preparer, Woods, testified that he arrived at the interest income, the dependency *79 deduction claimed for petitioner's mother, the income and expenses related to the Barbados property, and the deduction of the litigation settlement all from information supplied by petitioners. That information was either incomplete or wrong, and led to the filing of inaccurate returns. Thus, petitioners have failed to show good faith reliance on Woods' expertise. In addition, petitioners have failed to establish that the positions taken on their returns with respect to the erroneously reported items had a reasonable basis. The record does not suggest any basis for (1) failing to report that the pension distribution was subject to the 10-percent tax under section 72(t), (2) for overstating the basis of assets sold during 1988 by $ 75,000, (3) for reporting passive interest as investment interest, or (4) for failing to report interest income. Under such circumstances, petitioners may not shift responsibility for the accuracy of their returns to their accountant. For such reasons, we sustain respondent's determination of additions to tax under section 6653(a)(1)(A) and (B) for 1987 and section 6653(a)(1) for 1988. III. Addition to Tax Under Section 6661
Respondent determined *80 an addition to tax under section 6661 for the tax year 1988. For returns due before January 1, 1990, section 6661 provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement. An understatement is "substantial" when the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown or (2) $ 5000. The understatement is reduced to the extent that a taxpayer has (1) adequately disclosed his or her position, or (2) has substantial authority for the tax treatment of an item. Sec. 6661; sec. 1.6661-6(a), Income Tax Regs. Petitioners bear the burden of showing that they are not subject to this addition to tax determined by respondent. Rule 142(a). Petitioners contend that respondent abused her discretion in failing to waive the addition to tax under section 6661(c). Petitioners argue that, because they reasonably relied on their accountant and tax lawyers, and because they acted in good faith in reporting their tax liability, they cannot be held liable for the addition to tax under section 6661. Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991); *81 Lewis v. Commissioner, T.C. Memo. 1992-391, vacated in part and remanded in part by 18 F.3d 20 (1st Cir. 1994); sec. 1.6661-6(a), Income Tax Regs. As stated previously, the evidence shows that Woods relied on petitioners to supply the proper information for reporting petitioners' income tax liability. We do not believe that petitioners reasonably relied upon their accountant, to whom they failed to give complete information. In addition, given that petitioners concede that they could not support several items on their tax returns, we question whether they could be found to have acted in good faith. Further, we find that petitioners have not shown either adequate disclosure or substantial authority for the positions that they took on the return that gave rise to the understatement in question. Accordingly, we sustain respondent's determination of an addition to tax under section 6661. Decisions will be entered under Rule 155.