**UNUM CORPORATION and UNUM Life Insurance Company of America, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 93–369–P–C.

United States District Court,
D. Maine.

May 8, 1995.

William J. Kayatta Jr., Pierce, Atwood, Scribner, Smith & Lancaster, Barbara H. Furey, Barry W. Larman, UNUM, Portland, ME, for plaintiffs.

David R. Collins, Asst. U.S. Atty., Portland, ME, Scott H. Harris, U.S. Dept. Of

Justice, Tax Dept., Washington, DC, for Government.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

In this litigation, Plaintiffs UNUM Corporation and UNUM Life Insurance Company of America (collectively "UNUM") seek to amend UNUM's 1986 tax return to claim a deduction for an alleged dividend distribution pursuant to UNUM's conversion to a stock company. Now before this Court is the Motion for Summary Judgment filed by Defendant United States of America (hereafter, "Government") (Docket No. 23). In its motion, the Government argues that it is entitled to judgment as a matter of law on two affirmative defenses, judicial estoppel and the "duty of consistency," the operation of either of which would bar UNUM from seeking this deduction.[1] UNUM, on the other hand, responds that neither doctrine applies to these proceedings and that this Court should enter summary judgment in its favor on the affirmative defenses.

The Court of Appeals for the First Circuit has articulated the legal standard to be applied in deciding motions for summary judgment:

[T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325[, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248[, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904[, 96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent.

*Anderson,* 477 U.S. at 248[, 106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

*Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989). Accordingly, this Court will construe the facts presented on this motion in a light most favorable to the nonmoving party here, UNUM. The essential facts, which are not in dispute by the parties, considered by this Court on the present motion are as follows.

## I. FACTS

Union Mutual Life Insurance Company ("Union Mutual"), the forerunner of UNUM, was organized as a mutual insurance company in Maine in 1848, and prior to its 1986 conversion to a stock company, it was "engaged in the business of writing various forms of life insurance, health, accident insurance and annuity products." Govt. Ex. 1 at 4. In December 1984, Union Mutual filed with the Maine Bureau of Insurance a "Plan of Recapitalization and Conversion" (hereafter "Plan") detailing its proposed conversion from a mutual insurance company into a stock insurance company which would be

---

**1.** This Court notes that, in its answer, the Government asserted four affirmative defenses, the two that are the subject of the present motion along with the defenses of equitable estoppel and

UNUM's alleged failure to plead that it had filed an amended return for tax year 1986. United States' Answer (Docket No. 4) at 16–18.

wholly owned by a new holding company. Government Exhibit (hereafter "Govt. Ex.") 2.[2] The Plan was devised in a manner to gain the necessary approval for the conversion by the Maine Bureau of Insurance, acting through the Superintendent of Insurance (hereafter "Superintendent"). The receipt of such approval depended on whether Union Mutual had demonstrated to the Superintendent that the Plan complied with certain requirements set out in Maine law with respect to such conversions by mutual insurance companies. 24–A M.R.S.A. § 3477. A few months earlier, and also as a part of the planned conversion, Union Mutual submitted to the Internal Revenue Service (hereafter "IRS") a request for a letter ruling on the tax consequences for both the company and its policyholders of the proposed conversion or "demutualization." [3] Govt. Ex. 3.

In both of these documents, Union Mutual set out its proposal for conversion to a stock company and the anticipated effects on Union Mutual's policyholders of such a conversion. Specifically, Union Mutual explained how its current and recent policyholders, who qualified as "members" under Maine law, would be entitled to their "equity share" of Union Mutual's surplus, which was in excess of $652 million, upon the conversion, a process which would extinguish their "membership rights." [4] Govt. Ex. 2 at A–4, A–5. Among these rights is the preemptive right to acquire the stock of the company, prior to any public offering, in the event that the company converts to a stock insurance company.[5] The Plan provided that these members or "eligible policyholders" would, in exchange for their membership interests, receive stock (or, more accurately, credit towards a stock purchase) in the new company in an amount equivalent to the fair market value of their equity shares, and that certain eligible policyholders could elect to receive cash as their equity shares.[6] Govt. Ex. 2 at

**2.** The Plan was subsequently amended on June 14, 1985, to conform to changes to section 3477 of Maine's insurance statute. Govt. Ex. 11. None of the provisions in the Plan discussed herein was altered significantly.

**3.** A letter ruling is "a written statement issued to a taxpayer . . . by the National Office [of the IRS] which interprets and applies the tax laws to a specific set of facts." 26 C.F.R. § 601.201(a)(2).

**4.** The Plan distinguishes between "equity shares," which are defined as "the dollar amount of that part of Union Mutual's Adjusted Surplus attributable to that Eligible Policyholder on the basis of the allocation formulas referred to in Part B of Exhibit III to this Plan," and "membership interests," which are defined as "all rights or interests of each party and contract holder of Union Mutual including but not limited to, any right to vote, any rights which may exist with regard to the surplus of Union Mutual not apportioned by the Board as policyholder dividends, and any rights in liquidation or reorganization of Union Mutual, but shall not include any other right conferred by a policyholder's insurance policy or contract." Govt. Ex. 2 at A–1 to A–2. The Plan then states, "In exchange for their Membership Interests, Eligible Policyholders will receive Conversion Stock or cash as described in Part VII of this Plan." Id. at A–4. Part VII of the Plan provides that the equity share represents the consideration that will be provided to eligible policyholders in exchange for their membership interests. Only "Cash Option Eligible Policyholders" had the option of receiving their entire equity shares in cash or applying that equity share towards the purchase of stock. All other

policyholders' equity shares were automatically applied towards the purchase of stock. Id. at A–5.

**5.** The Maine insurance code lists several prerequisites to approval by the Superintendent of any planned recapitalization and conversion. Among the items that a mutual insurance company must demonstrate to the Superintendent are the following:

E. The members entitled to participate in the purchase of stock or distribution of assets shall include not less than all policyholders of the insurer as of the date the plan was submitted to the superintendent and each existing person who had been a policyholder of the insurer within 3 years prior to such date;
F. Shares are to be offered to members at a price not greater than to be thereafter offered under the plan to others;
G. The plan provides for payment to each member of his entire equity share in the insurer, with that payment to be made in cash or to be applied for or upon the purchase of stock to which the member is preemptively entitled, or both. . . .

24–A M.R.S.A. § 3477.

**6.** In addition to the "cash option eligible policyholders," a number of other eligible policyholders received cash payments as part of the distribution since the Plan did not authorize the distribution of fractional shares and, instead, permitted cash refunds for "such amounts that cannot be applied to the purchase of whole shares." Govt. Ex. 2 at A–5.

A-5. The Plan and request for letter ruling also detailed the method through which the policyholders' equity shares would be calculated for the purposes of the distribution of cash and stock. Govt. Ex. 2 at A-16.

The purpose of the letter ruling request to the IRS was to learn the potential federal taxation consequences of the proposed transaction. Essentially, Union Mutual sought to demonstrate that the transactions in which policyholders transfer their interests to the holding company and receive stock in exchange fell under the description in section 351 of the Internal Revenue Code (the "Code") of a "tax-free exchange."[7] Additionally, the submission stated that simultaneous exchange of the members' equity interests acquired by the holding company for the voting common stock of the new company was a "tax-free recapitalization" under section 368(a)(1)(E).

Pursuant to a Revenue Procedure regarding section 351 exchanges, Rev.Proc. 83-59, 1983-2 C.B. 575 (1983), Union Mutual represented to the IRS that each of these exchanges was between parties with interests of equal value. In an appendix attached to its initial submission to the IRS, Union Mutual represented that "[e]ach transferor will receive stock of [the holding company] approximately equal to the fair market value of the property (*i.e.*, equity interests in Union Mutual and/or cash) transferred to [the holding company] in the proposed transaction." Govt. Ex. 6 at F-7. Similarly, in compliance with a different Revenue Procedure, Rev. Proc. 81-60, 1981-2 C.B. 680 (1981), which addressed section 368 reorganizations, Union Mutual represented that "[t]he fair market value of Union Mutual's voting common stock to be received by [the holding company] will equal the fair market value of the equity interest exchanged." Govt. Ex. 10 at G-3.

The questions raised in Union Mutual's request for a letter ruling were complex and, in many respects, matters of first impression

for the IRS. UNUM Ex. 1. As a result of the challenging issues presented in Union Mutual's request, the IRS asked Union Mutual to make supplementary submissions on certain points of law. Among the issues under consideration by the IRS was whether the reorganization plan resembled that of a conversion of a mutual savings and loan to a stock savings and loan, which would implicate case law and an IRS Revenue Ruling characterizing such reorganizations as not qualifying for tax-free treatment under section 368(a)(1), Rev. Rul. 80-105, 1980-1 C.B. 78 (1980). Govt. Ex. 8 at 23-24. In a submission dated March 25, 1985, Union Mutual argued that a policyholder's equity interest has substantial value when compared with the "nominal" interest of a savings and loan depositor since the former can be used to acquire marketable stock, whereas a depositor must pay cash to acquire shares in the conversion. Govt. Ex. 8 at 23-30.

On November 8, 1985, Union Mutual made an additional submission to the IRS in its request for a letter ruling. Govt. Ex. 11. This statement specifically addressed the tax treatment of the transactions involving those policyholders who would receive their equity shares in the form of cash, rather than stock. Union Mutual made it clear that it was not seeking a ruling on such tax consequences since such an analysis of the complicated issue of law could hold up the ruling on the conversion itself. Nonetheless, Union Mutual did state that the cash received by such policyholders as a result of the transaction could be viewed as either a capital gain from a "redemption" exchange for their equity interests or that the cash could be characterized as a policyholder dividend, taxable to the policyholders as ordinary income and permitting Union Mutual to deduct these cash payments under section 805(a). Specifically, Union Mutual observed that "policyholder dividends" are nothing more than payments out of a mutual insurance company's surplus resulting from an "aggregation of over-

---

7. Section 351 of the Internal Revenue Code provides, in pertinent part:

   **Transfer to corporation controlled by transferor.**

   **(a) General rule.** No gain or loss shall be recognized if property is transferred to a cor-

poration by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

26 U.S.C. § 351.

charges," precisely the scenario presented in the UNUM conversion. In that submission, Union Mutual provided an extensive analysis of how such cash payments could properly be characterized as policyholder dividends under federal tax law and concluded that the analysis "strongly suggests that any payment to a policyholder from the surplus of a mutual insurance company is in the nature of a policyholder dividend." Govt. Ex. 11. 13–21. Union Mutual also asserted, "[I]t is not inconsistent with the treatment of other aspects of this conversion under Subchapter C [*i.e.*, sections 351 and 368] to also determine the nature of the payments under Subchapter L [Insurance Companies, including section 808, policyholder dividends deductions]." *Id.* at 21. UNUM concludes the submission by stating,

Finally, however, we wish to emphasize again that Union Mutual does not here seek a ruling on cash distributions. Moreover, it fervently hopes that consideration of this question, which is admittedly unique and therefore highly interesting, will not prevent or delay the issuance of the rulings it has sought on the conversion.

*Id.* at 21–22. The IRS had requested the submission only with respect to the cash payments to certain policyholders. Consequently, the treatment of stock credit exchanged for equity shares was not discussed in the November 8, 1985, letter.

In July 1986, the Superintendent held public hearings on the Plan. In preparation for such hearings, Union Mutual was required to make available for review by the Superintendent any documents that Union Mutual planned to use to disclose the terms of the Plan to the policyholders. Govt. Ex. 14 at 9. One of those documents was a prospectus, in which Union Mutual stated that the exchange of stock for the equity interests of the policyholders would not result in the recognition of either gain or loss under federal tax laws. Govt. Ex. 18. In the prospectus Union Mutual made the following representations to its policyholders:

### Federal Income Tax Consequences

Union Mutual has been advised by [Tax Counsel] that, based on current law, the Conversion will result in a tax-free reorganization for federal income tax purposes. There will be no gain or loss recognized by Union Mutual or by the Corporation upon the Conversion.... Union Mutual has also requested a private letter ruling from the [IRS] substantially to the same effect.

Tax Counsel has also opined that ... the receipt of Common Stock by Eligible Policyholders in exchange for their equity interests in Union Mutual will not result in the recognition of gain or loss for federal income tax purposes....

Although Tax Counsel has rendered an opinion with respect to the above matters, it should be noted that the Conversion presents several novel issues and that, accordingly, no assurance can be given that the [IRS] will issue a letter ruling in accordance with such counsel's opinion or that the [IRS] will not challenge the conclusions set forth above.

. . . .

The tax treatment of the receipt of cash in the Conversion by Eligible Policyholders is less certain. Such cash may be treated as an amount received by Eligible Policyholders in exchange for their equity interests in Union Mutual and thus would be fully taxable to them as capital gains. In the alternative, the cash payments, either in whole or in part, may be treated as policyholder dividends. Union Mutual is considering whether treatment of these payments as policyholder dividends is appropriate, in which event Union Mutual would be entitled to a tax deduction for the payments....

... Eligible Policyholders are strongly urged to consult their own tax advisors as to the consequences of the receipt of stock or cash pursuant to the Plan of Conversion under federal, state, local or foreign tax laws.

Govt. Ex. 18 at 7–8.

At the hearings before the Superintendent, Union Mutual's tax counsel testified that such policyholders would receive the shares in a "tax-free manner" and would not be taxed until they realize a gain by selling the stock. He also testified that the cash received by certain eligible policyholders could

be treated as either policyholder dividends or as payments received for their equity interests, taxable as capital gains. Govt. Ex. 24 at 4–5.

In August 1986, the Superintendent issued a final decision and order approving the Plan. Govt. Ex. 13. The only discussion in the sixty-page opinion of the tax implications of the Plan was under the "Disclosure" section, where he noted that Union Mutual's disclosure to its policyholders through the statements contained in the prospectus "reasonably discloses to policyholders the potential tax treatment of the Plan." *Id.* at 42. The Superintendent concluded that, "[t]aken as a whole, the terms and conditions of the Plan of Conversion and the procedures proposed are fair and equitable in accordance with [24–A M.R.S.A.] Section 3477(2)(A) ... [and that the Plan] satisfies each of the other specific applicable requirements set forth in [24–A M.R.S.A.] Section 3477." Govt. Ex. 13 at 59.

The Plan was approved by an overwhelming majority (96.8%) of Union Mutual's policyholders, UNUM Ex. 5, and on November 14, 1986, the conversion was implemented. Pursuant to the Plan, $129,738,478 in cash was distributed to cash eligible policyholders and $522,471,336 was credited towards policyholders' stock purchases in the newly formed company. Fifteen percent of the total amount of the distribution was "attributed to the cancellation of the intangible membership rights of the Eligible Policyholders," amounting to a minimum of $612.25 per policyholder. Govt. Ex. 1 at 8. The other eighty-five percent of the distribution was based on the accumulated contribution to Union Mutual's surplus made by policyholders through excess premium payments over time.

The following month, on December 16, 1986, the IRS issued its letter ruling. Govt. Ex. 27. The IRS agreed with Union Mutual's assertion that the transfer of equity interests by the policyholders in exchange for stock was an "exchange" within the meaning of section 351 and that, therefore, no gain or loss would be recognized on the transaction.

*Id.* at 9–10. It also concluded that the change in form from mutual to stock company and the exchange of equity interests involved in such conversion was a "tax-free reorganization" under section 368(a)(1)(E). *Id.* at 11. Finally, although Union Mutual had not requested such a ruling, the IRS concluded that the cash payments to policyholders were received by them "in redemption of their equity interests" and, therefore, were not properly characterized as policyholder dividends. *Id.* at 12.

In January and February of 1987, UNUM distributed 1099–B forms to all of the policyholders who had received cash payments. UNUM also enclosed a letter to those policyholders advising them of the outcome of the letter ruling. Govt. Ex. 29. UNUM prefaced its remarks with the statement, "While we can not provide you with tax advice and strongly suggest that you consult your own tax advisor, we want to provide you with certain information which was disclosed to us in the private letter ruling." *Id.* Specifically, the policyholders were told that the full amount of cash to policyholders is currently taxable and generally treated as a "long-term capital gain" and that the receipt of stock for the equity interests was not currently taxable.

When UNUM filed its tax return for tax year 1986, it did not claim a policyholder dividend deduction for either the cash or stock distribution and attached a copy of the letter ruling. The taxation issues raised in the demutualization resulted in a two-year-long audit of the 1986 return by the IRS beginning in 1988. Specifically, the IRS sought to ensure that UNUM had, in fact, complied with the letter ruling and that the "primary concern" of one of the agents assigned to the audit was to analyze the policyholder dividend issue. Deposition of Domenic Federico at 33 and 39. During the audit, the IRS sought two extensions of the period of limitations for any assessment of underpayments for tax year 1986. UNUM consented to these extensions, ultimately providing the IRS with a deadline of March 15, 1992, to assess any deficiency.[8] UNUM Ex.

---

8. In 1990, the limitations period to assess underpayments for the corporate and individual policyholders expired.

7. Additionally, the extension agreements provide that, "[t]he taxpayer(s) may file a claim for credit or refund and the [IRS] may credit or refund the tax within 6 months after this agreement ends." *Id.*

On May 5, 1992, less than two months after the period of limitations expired but within the six-month period in which UNUM could seek a refund of taxes from tax year 1986, UNUM filed an amendment to its return for tax year 1986, seeking a refund of taxes on the basis that the distribution of over $129,000,000 in cash pursuant to the conversion was a policyholder dividend as defined by section 808 of the Code and was, therefore, deductible under section 805(a)(3). Govt. Ex. 35. On September 25, 1992, UNUM filed an additional request for a refund,[9] this time claiming that the distribution of stock during the conversion was a policyholder dividend as well and, therefore, that UNUM is entitled to a deduction in an amount equal to the stock's fair market value.[10] Govt. Ex. 36.

After the IRS rejected both claims, UNUM filed a formal letter of protest. Govt. Ex. 1. This letter was followed a few months later by a letter from UNUM representative Barry Larman, who asserted in support of the refund request that, "each policyholder's interest which was extinguished in the Conversion was basically valueless." Govt. Ex. 37 at 2. Larman further stated UNUM's position as asserting that "the stock received by the policyholders in the Conversion was not received tax-free under section 354 ... [since it] was so fundamentally different from the membership interests they held in a mutual life insurer." *Id.* at 6. In contrast with the share the policyholders received in the conversion, Larman reasoned, the membership interests were "without any discernable value," since

they could not be "sold, given away, or transferred at death[;] ... borrowed against[;] ... purchased separate from a policy[; or] ... terminated when the policy terminated." *Id.* In December 1993, UNUM commenced this action to recover the alleged overpayment.

## II. DISCUSSION

### A. Judicial Estoppel

The Government argues on this motion that UNUM should be estopped from making the arguments and representations set out in the Complaint since, as the Government alleges, they are inconsistent with representations made in the proceedings before the Superintendent. The estoppel theory advanced by the Government is known as judicial estoppel, a doctrine which operates to preclude a party from "asserting a position in one legal proceeding which is contrary to a position it has already asserted in another." *Patriot Cinemas v. General Cinema Corp.*, 834 F.2d 208, 212 (1st. Cir.1987).

The primary concern of the doctrine, which has been recognized by many courts of appeals, including the Court of Appeals for the First Circuit, is "to protect the integrity of the judicial process," *United States v. Levasseur*, 846 F.2d 786, 792 (1st Cir.), *cert. denied*, 488 U.S. 894, 109 S.Ct. 232, 102 L.Ed.2d 222 (1988), and to prevent "a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Teledyne Industries, Inc. v. N.L.R.B.*, 911 F.2d 1214, 1218 (6th Cir.1990). Judicial estoppel operates to bar a litigant from " 'playing fast and loose with the courts,' ... when 'intentional self-contradiction is being used as a means of

9. Although UNUM seeks to claim a deduction for the 1986 tax year, it is not, strictly speaking, seeking a refund for taxes paid during that tax year. According to its return, UNUM received no taxable income during 1986. It did, however, receive taxable income during the previous and subsequent years. Therefore, UNUM seeks to have the 1986 loss created by the deduction carried back for the previous three years and forward for the following two years under section 801 of the Code. Govt. Ex. No. 1.

10. UNUM alleges that it sought the dividend only after it learned of the decision of the United States Court of Appeals, *Ruocco v. Bateman, Eichler, Hill, Richards, Inc.*, 903 F.2d 1232, 1237 (9th Cir.), *cert. denied*, 498 U.S. 899, 111 S.Ct. 254, 112 L.Ed.2d 212 (1990), which concluded, as a matter of California insurance law, that the distribution of stock by Union Mutual to its policyholders during the 1986 conversion constituted a dividend.

obtaining unfair advantage in a forum provided for suitors seeking justice.'" *Patriot Cinemas*, 834 F.2d at 212 (quoting *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)). *See also McKinnon v. Blue Cross & Blue Shield*, 935 F.2d 1187, 1192 (11th Cir. 1991) ("'The doctrine [of judicial estoppel] is designed to prevent parties from making a mockery of justice by inconsistent pleadings.'") (quoting *American National Bank v. Fed. Dep. Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir.1983)).

■ To apply the doctrine, a court must determine that the necessary elements are present. A litigant, as an initial matter, must, in effect, "have made a bargain" with the tribunal of the first proceeding by making certain representations to the tribunal in order to obtain a particular "benefit" from the tribunal. *Levasseur*, 846 F.2d at 792. Additionally, the position taken in the second litigation must be "inconsistent with one successfully and unequivocally asserted by that same party in a prior proceeding," *Brewer v. Madigan*, 945 F.2d 449, 455 (1st Cir.1991), regarding a matter "material" to the outcome of the prior proceeding, *United States v. Kattar*, 840 F.2d 118, 130 n. 7 (1st Cir.1988). *See also Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 358 (Fed.Cir.1992) (applying First Circuit law and concluding that, in order to invoke judicial estoppel, a party must demonstrate that the other party "obtained a litigation benefit" in prior proceedings). Finally, the First Circuit has implied in a recent opinion that, in the absence of "deliberate dishonesty [or] ... any serious prejudice to judicial proceedings or the position of the opposing party," the doctrine should not be applied. *Desjar-*

*dins v. Van Buren Community Hospital*, 37 F.3d 21, 23 (1st Cir.1994). Therefore, although the First Circuit had initially embraced the doctrine of judicial estoppel with enthusiasm in *Patriot Cinemas*, it has since imposed many requirements on a party seeking estoppel before a court may take the extraordinary step of rejecting a litigant's entire argument without any consideration of its merits.

■ The "prior proceedings" in this case, according to the Government, consist of the approval process before the Superintendent. Administrative proceedings, such as those before the Superintendent are considered "proceedings" under the doctrine of judicial estoppel. *See, e.g., Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993). It is less clear, however, that UNUM struck any "bargain" with the Superintendent and that it is "attempt[ing] to invoke the authority of one tribunal to override or flout a bargain made with another," in these proceedings. *Levasseur*, 846 F.2d at 793. From the record before this Court, it appears that the potential tax consequences of the conversion was not a consideration in the Superintendent's findings, nor should it have been, according to the Maine statute.[11] The sole reference to taxes in the Superintendent's Decision and Order was his conclusion that Union Mutual had reasonably notified its policyholders of the potential tax consequences.[12] That disclosure, the pertinent part of which is quoted *supra*, specifically warned all policyholders to seek independent legal advice on the taxation of their cash or stock since the treatment of such property exchanges was not clearly established in the

11. The Government argues that the Maine statute requires that, in a conversion to a stock insurance company, a mutual insurance company must provide "payment to each member of his [sic] entire equity share in the insurer." 24–A M.R.S.A. § 3477(2)(G). Therefore, according to the Government, UNUM *had to* represent to the Superintendent that the policyholders would receive the cash and stock distribution *in exchange* for their membership interests and, therefore, the distribution could not have been a policyholder dividend. The Court rejects this reasoning. From the record submitted on this motion, the Court cannot discern any statement by either party that the policyholders did *not* receive their entire equity share. In fact, it appears that

UNUM alleges in this litigation that the policyholders received something *more* than their equity share, but certainly not less. Thus, the Government has failed to demonstrate to this Court that *any* conversion plan found to be fair and equitable under the Maine insurance code must necessarily *not* constitute a policyholder dividend under federal tax law.

12. *See Teledyne Industries, Inc. v. N.L.R.B.*, 911 F.2d 1214, 1218 (6th Cir.1990) (holding that, in order for judicial estoppel to operate, the first court must actually adopt the litigant's position that he or she now contradicts).

law. Indeed, the Superintendent himself has provided an affidavit in this litigation stating that he did not consider any of the statements made by Union Mutual to be the basis of any "bargain" in the proceedings.[13]

Moreover, it does not appear that Union Mutual, in fact, made any representations to the Superintendent that could have formed the basis for the application of judicial estoppel. The Government asserts that by using the word "exchange" during the proceedings, Union Mutual made a representation to the Superintendent that the distribution of stock to policyholders was not a dividend. The Government also argues that statements made by Union Mutual's tax counsel served as the basis of a bargain with the Superintendent that the transaction constituted a tax-free exchange and that UNUM would not, therefore, claim the stock distribution as a policyholder dividend. However, all of the specific statements regarding the taxation of the stock and cash received by the policyholders pursuant to the conversion were clearly the legal opinions of Union Mutual's tax counsel, and not representations of fact.[14] In addition, these opinions were usually accompanied by caveats since the specific issues were unique and unsettled in tax law. It is particularly clear that UNUM is not taking inconsistent positions with respect to the tax treatment of the cash payments, as opposed to stock, received by policyholders since, throughout the conversion process, UNUM consistently stated that such payments could be treated as policyholder dividends.

The statements regarding the relative "value" of the membership or "equity interests" transferred for stock also fail to provide a basis for the operation of estoppel here. The circumstances of the proceedings before the Superintendent and the ongoing uncertainty of the tax implications of the entire conversion prevents this Court from concluding that any present position taken by UNUM in the present litigation is "truly inconsistent" with the assertions made in the proceedings before the Superintendent; " '[f]or the invocation of the doctrine, the two positions must be diametrically opposed.' " *Levasseur*, 846 F.2d at 794 (quoting Comment; *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel*, 80 Nw. U.L.Rev. 1244, 1263–64 (1986)).[15] The mem-

**13.** The Superintendent's affidavit provides, in part:

> I did not construe [Union Mutual's] submission or disclosure of the opinions of its tax counsel as representing or guaranteeing the position or positions that [Union Mutual] would finally take on its tax returns as and when it was required to do so under federal law. I did not condition my order on the ultimate correctness of the opinions, nor did I ever seek or receive any direct or indirect assurance as to the position [Union Mutual] would take on its returns when it was required to do so under federal law.

Affidavit of Theodore T. Briggs, former Superintendent of Insurance, (Docket No. 33) at ¶ 3.

**14.** The Government argues that, under the law of this circuit, even prior legal positions taken by litigants can be the basis for judicial estoppel. Specifically, it points to language in *Patriot Cinemas*, stating that the facts of that case differed from the "classic" judicial estoppel scenario since the litigant was not asserting "inconsistent statements of fact or adopt[ing] inconsistent positions on combined questions of fact and law." *Patriot Cinemas v. General Cinema Corp.*, 834 F.2d 208, 214 (1st Cir.1987). The conclusion drawn by the Government is that the "legal" position of the litigant in *Patriot Cinemas* was inconsistent with an earlier "legal" position.

This Court concludes that the Government has misconstrued the panel's language in *Patriot Cinemas*. In that case, the earlier statement was an assertion made to a court that it would not proceed on a particular claim in another court, and, therefore, was a "legal" assertion only in the sense that it "pertained to legal proceedings." The case does not provide authority for the Government's argument here that inconsistent legal *opinions* of a litigant's counsel can invoke the application of judicial estoppel. *See also Lockheed Sanders v. United States*, 862 F.Supp. 677, 684 (D.N.H.1994) ("Where only legal conclusions or opinions are involved, courts have refused to apply judicial estoppel.").

**15.** Interestingly, the Government asserts that, at one point during the proceedings, UNUM, in fact, did argue that the policyholder's membership interests had only an "illusory value" but that the Superintendent rejected that position, based in part on representations made to the IRS by tax counsel that the interests resembled the "rights of stockholders in a corporation and have substantial value." Govt. Memorandum at 9 n. 9 (quoting Govt. Ex. 15 at 21 and Govt. Ex. 14 at 15–16).

The context of those remarks, however, was an analysis under Maine insurance law regarding whether Union Mutual's members can be consid-

oranda of both parties contain extensive arguments about the relative meanings attached to words such as "exchange," "redemption," and "value." The IRS itself was so unsure of the tax implications of the conversion, an event characterized by an IRS employee as "ground breaking," Deposition Testimony of Donald E. Osteen at 40, that it conducted an extensive audit of the entire transaction. A central concern during this analysis is how to properly *characterize* the components of the transaction, since there were no clearly applicable provisions in the Code. This Court is satisfied that the issues regarding the taxation of the stock were novel and ill-defined at the time of the conversion and that the law was so unsettled that it would be unjust to assign a particular meaning to those statements in hindsight.

In addition to these fundamental obstacles to the application of judicial estoppel here, none of the other prerequisites to the doctrine can be found in this litigation. UNUM cannot be said to have "successfully" advanced any statement regarding the tax consequences. The Court of Appeals for the Fourth Circuit has held that, in order to protect the "truth-seeking function of the court, while preserving the court's integrity," a party asserting the doctrine must demonstrate that the prior court "adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Teledyne Industries*, 911 F.2d at 1218. As already mentioned, federal taxation was not a concern for the Superintendent, beyond his review of what was disclosed to the policyholders. Maine law does not require a finding of any specific tax treatment of a demutualization before approval can be granted. It appears that, regardless of what Union Mutual opined would be the correct taxation of the stock and cash, as long as this opinion

was reasonably disclosed to the policyholders with appropriate caution, it would not have been an impediment to approval by the Superintendent.

Finally, this case falls far short of demonstrating any "deliberate dishonesty" that amounts to "playing fast and loose" with the tribunals here. There are no allegations raised by the Government that Union Mutual or UNUM, at any time, withheld information, misled agents, or made any misrepresentation in the course of the IRS's ongoing relationship with the insurance companies. Indeed, during the audit, IRS agents pored over every document and record associated with the conversion and distribution to policyholders. Since this Court must apply the doctrine of judicial estoppel "with caution to avoid impinging on the truth-seeking function of the court," *Teledyne Industries*, 911 F.2d at 1218, and because the "representations" made by Union Mutual and UNUM are far from being on all fours with the doctrine's elements, this Court declines to impose the extraordinary remedy of barring UNUM's arguments in this litigation.

### B. Duty of Consistency

■ The Government also argues that under the tax-law doctrine of "quasi-estoppel" or a taxpayer's "duty of consistency," UNUM should be precluded from claiming that the distribution of stock and cash to its shareholders pursuant to the 1986 conversion constitutes a deductible dividend. Specifically, the Government asserts that positions taken by Union Mutual and UNUM in the 1986 tax return, the letter ruling submissions, and the 1099–B forms mailed to policyholders in early 1987—that the distribution of surplus in exchange for the membership interests constituted a section 351 transaction—are incon-

---

ered to have "ownership interests" in Union Mutual, entitling them to receive more than the statutory surplus upon the conversion. UNUM also noted in that memorandum that, to the extent the policyholders did have any "ownership interests," they were "in some limited respects analogous to the true ownership interests of stockholders in a corporation, but they are undeniably *not* the same." Govt. Ex. 15 at 6. Thus the discussion did not address the relative value of the policyholder's "membership interests."

The Superintendent concluded that, under Maine law, the policyholders were the owners of Union Mutual, not in the sense that they had "legal title to a specific portion of the property of the insurer, [but] it does mean that the members, as a group, possess beneficial interests in the insurer's assets as a whole ... [which] must be accorded recognition when a major corporate reorganization, such as demutualization, is proposed." Govt. Ex. 14 at 14–15.

sistent with its current position that it is entitled to a dividend deduction as a result of that distribution. Therefore, the Government argues, UNUM's duty of consistency should operate to estop UNUM from asserting the contrary now, and the IRS may act as if the prior representation (*i.e.*, that the distribution was a section 351 transaction) remains true.

The duty of consistency, as recognized in this circuit, "prevents a taxpayer who has already had the advantage of a past misrepresentation—in a year now closed to review by the government—from changing his position and, by claiming he should have paid more tax before, avoiding the present tax." *Lewis v. Commissioner,* 18 F.3d 20, 26 (1st Cir.1994). The law is clear that this duty applies only when the "earlier taxpayer position amounts to a misstatement of fact, not of law." *Id.* Finally, the Government must demonstrate that this earlier misrepresentation was "one on which the government reasonably relied, in the sense that it neither knew, nor ought to have known, the true nature of the transaction mischaracterized by the taxpayer." *Id.*

The Government argues that because UNUM took the position on its 1986 return that the exchange of stock for the policyholders' membership interests qualified as a section 351 transfer, the Government relied to its detriment on that position since it did not assess deficiencies for tax year 1986 with respect to both UNUM's and its policyholders' returns with the applicable period of limitations. Alternatively, the Government asserts that, in its letter ruling submissions, Union Mutual stated that the exchange of stock and equity interests represented a "value-for-value exchange," and specifically distinguished the policyholders interests from the merely "nominal" interests of savings and loan depositors. These "representations" were then relied upon by the IRS in the issuance of its letter ruling. In its request for a refund, the Government points out, UNUM claims that the policyholders' membership interests were of "no discernable value," and, therefore, the exchange could not have been truly "tax-free."

Although UNUM appears to take different positions on the characterization and, consequently, the tax treatment of the conversion exchange, this reversal does not implicate the duty of consistency. The simple fact, as already noted, is that the parties do not dispute that at no point during any of the dealings between them did UNUM withhold information or misrepresent any facts. The facts known to the IRS now are the same as were available to its agents during the preparation of the letter ruling and the in-depth audit conducted in UNUM's headquarters. The statement regarding the "value" of the membership interests was not a factual representation based on information that the IRS neither knew, nor ought to have known, as is required to invoke the duty of consistency. Rather, this case resembles that in *Lewis,* where the central question in the litigation was not fact-finding *per se* but how certain facts should be characterized under federal tax law. *Id.* at 23.

Even more untenable is the Government's argument that because UNUM issued 1099–B forms to policyholders who received cash, it should be estopped from asserting that the over $129 million cash distribution was a policyholder dividend.[16] The Government acknowledges that those forms were mailed after UNUM received the letter ruling which specifically concluded that the cash distribution was not a policyholder dividend. It then argues, however, that the distribution of these forms in itself constitutes a representation to the IRS that the cash received was not a dividend, and that, since UNUM stated that it would comply with the letter ruling, the IRS relied on that statement and permitted the period of limitations to expire.

This Court notes, however, that not only does this argument addresses legal opinions rather than factual representations, but that UNUM was actually very consistent in its arguments that the cash distribution *could be* characterized alternatively as a redemption or a policyholder dividend. In fact, in one of the letter ruling submissions, UNUM provides an extensive and thorough analysis of the law, as it existed at the time, and con-

---

**16.** The Government attempts to lump the stock and cash distributions together for the duty of consistency analysis. This Court finds no basis for doing so.

cluded that it was most appropriate to treat the payments as policyholder dividends. The IRS, in its unsolicited ruling, disagreed, and UNUM then accurately reported this result to its former policyholders.[17] The fact that UNUM did not "put up a fight" over the issue at the time of the letter ruling does not constitute a "misrepresentation" of any kind.

Moreover, the Government has failed to demonstrate any reliance by the IRS to its detriment. The acquiescence of UNUM to the IRS's conclusions actually benefitted the IRS since UNUM did not take the deduction and the policyholders were instructed to claim the income as taxable. The Government has not shown this Court that it has been prejudiced by the expiration of the limitations period with respect to any policyholder. The reliance requirement, according to the recent Tax Court decision submitted by the Government with its memorandum, is met "when a taxpayer files a return that contains an inadequately disclosed item and [the IRS] accepts that return and allows the period of limitations to expire without an audit of that return." *Hughes and Luce, L.L.P. v. C.I.R.*, 68 T.C.M. (CCH) 1169, 1994 WL 604047 (U.S.Tax Ct. Nov. 3, 1994) (No. 17904–93) at 11. Unquestionably, the Government's defense fails under this approach as well since there was no "inadequately disclosed item," and, of course, the IRS did conduct an extensive audit within an extended limitations period.

With respect to both the cash and stock distribution, the uncontroverted evidence is that IRS agents recognized that UNUM had a continuing right, until six months after the expiration of the limitations period, to file an amended return and seek a refund, as they have done here. Deposition Testimony of Domenic Federico at 33, 36; Deposition Testimony of Anthony Roloff at 78. The IRS also recognized that UNUM has filed a very "conservative" return, UNUM Ex. 6, and there was a note in the audit file observing that UNUM had never claimed a dividend

deduction on the 1986 return and that it "[m]ay file a claim later on." Deposition of Federico, Ex. 4. UNUM never promised to not seek a refund nor did the IRS sign a closing agreement with UNUM to guarantee that the tax year would be closed to further adjustment. The fact that the limitations periods expired on the policyholders' returns prior to UNUM's deadline to seek a refund cannot operate to cut off prematurely UNUM's right to amend. Therefore, the duty of consistency is not implicated by any of UNUM's positions in the present litigation.

### III. CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment is *DENIED*.

So *ORDERED.*

---

17. The conclusion in the letter ruling regarding the treatment of the cash payments addressed how the payments should be characterized, thus indicating that the IRS never considered the issue to be one of determining facts but, rather, the proper treatment of the payments under tax law. In its letter ruling, the IRS *disagreed* with UNUM's arguments that the cash should be treated as a dividend. This disagreement, of course, was not regarding a factual dispute since, in the preparation of any letter rulings, the IRS accepts the "facts" as they are presented by the taxpayer requesting the ruling. 26 C.F.R. § 601.201(a)(2); Deposition of Donald E. Osteen at 91.